IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CLARISSA QUINTANA, and** | : | **CIVIL ACTION** |
| **HAZEL ROSARIO,** | : | |
| Plaintiffs, | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| **CITY OF PHILADELPHIA, et al.** | : | |
| Defendants. | : | **NO. 10-6088** |

**MEMORANDUM AND ORDER**

L. FELIPE RESTREPO                                                                                        JULY 20, 2011
UNITED STATES MAGISTRATE JUDGE

On November 8, 2010, Plaintiffs Clarissa Quintana and Hazel Rosario filed a complaint against a number of individual City of Philadelphia police officers, alleging civil rights violations, pursuant to 42 U.S.C. § 1983, and a number of pendent state law claims. Plaintiffs also assert a claim against the City of Philadelphia, contending that the City had a policy, practice or custom of allowing officers to violate citizen's constitutional rights. Before the Court is Defendant City of Philadelphia's Motion for Summary Judgment and Statement of Undisputed Facts (Doc. 10) (hereinafter cited as "Def.'s Memo" and "Def.'s Facts"), Plaintiffs' response thereto (Docs. 12, 13) (hereinafter cited as "Pls.' Resp."), and Defendant's reply (Doc. 14). For the reasons set forth below, Defendant's Motion will be granted.

## I. Background[1]

Plaintiffs allege that at approximately 2:30 a.m. on February 14, 2009, they were present on the 4500 block of North Fifth Street in Philadelphia, Pennsylvania, intending to pick up Chinese food that they had ordered. (Pls.' Resp. 1-2.) A crowd had gathered around a man, who appeared to Plaintiffs to be injured upon their arrival at the scene. (Id. at 2.) Two men then attempted to help the injured individual across the street, and Plaintiffs assisted by clearing a path through the crowd. (Id.) Several Philadelphia police officers, who were present at the scene, then approached Plaintiffs and began engaging them in a verbal exchange. (Id.) Plaintiffs assert that this exchange was followed immediately by a physical assault on them, which was instigated by the officers. (Id.) Police records indicate that Officer Lynch struck Ms. Quintana in the face with a closed fist and Officer Judge tasered her. Records also show that Officer Pagan struck Ms. Rosario in the arm and head with a police baton. (Def.'s Memo, Ex. A.) Defendant City of Philadelphia does not dispute that Defendant Officers Lynch and Judge used physical force upon Ms. Quintana, or that Officer Pagan used physical force upon Ms. Rosario on the night of February 14, 2009. (Def.'s Facts 1.)

Ms. Rosario received medical treatment for her injuries; specifically, she received six staples to close a wound on her head. (Pls.' Resp. 3.) Ms. Quintana refused medical treatment. (Id.) Both Plaintiffs were later charged criminally with criminal conspiracy, aggravated assault, simple assault, and reckless endangerment. (Def.'s Facts 1-2; Pls.' Resp. 3.) To date, charges against Ms. Quintana remain open, but charges against Ms. Rosario have been dismissed. (Def.'s

---

[1] The record reveals that Plaintiffs and Defendants offer considerably different versions of the events that took place on February 14, 2009. For purposes of Defendant's Motion, any factual disputes will be resolved in favor of Plaintiffs as the non-movants.

Facts 2; Pls.' Resp. 3.)

Plaintiffs' Complaint, filed on November 8, 2010, names as individual defendants Officers William Lynch, Jason Judge, and Floiran Pagan.  Plaintiff also names the City of Philadelphia as a defendant in this matter and asserts a claim of municipal liability, pursuant to 42 U.S.C. § 1983.  (Pls.' Compl. 2, 4.)  Specifically, Plaintiffs make the following allegations against the City of Philadelphia:

> (1) Defendant City of Philadelphia, as a matter of policy, practice and/or custom, has with deliberate indifference failed to adequately discipline, train and otherwise direct police officers and actually condones illegal and excessive force, including defendant police officers in this case.
>
> (2) Defendant City of Philadelphia, as a matter of policy, practice and/or custom, has with deliberate indifference failed to properly sanction or discipline police officers, including defendant officers thereby causing police officers to engage in conduct described above.
>
> (3) Defendant City of Philadelphia, as a matter of policy, practice and/or custom, has with deliberate indifference failed to conduct proper and balanced investigations of complaints of unreasonable use of force and excessive use of force against civilians by police officers, thereby causing and encouraging police officers, including defendant officers in this case, to engage in the unlawful conduct described above.
>
> (4) The acts and omissions of the City of Philadelphia, by and through high ranking officials of the Police Department, constitute institutional deliberate indifference and led directly to the unlawful assaults and batteries and torts described above.

(Pls.' Compl. 4 ¶¶ 16-19.)  Defendant moves for summary judgment on Plaintiffs' claim for municipal liability on the grounds that Plaintiffs have produced insufficient evidence to show that the City of Philadelphia, through custom, policy, or practice, exhibited deliberate

indifference to the constitutional rights of Plaintiffs. (Def.'s Memo 1.) Plaintiffs contend that they have presented sufficient factual and expert evidence to show that genuine issues of material fact remain as to the customs and practices of the Philadelphia Police Department that resulted in Plaintiffs' injuries. (Pls.' Resp. 1.)

## II. Legal Standard

Summary judgment is appropriately granted only where the moving party establishes that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Levy v. Sterling Holding Co., 544 F.3d 493, 501 (3d Cir. 2008). Only a factual dispute that is both genuine and material will defeat a motion for summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A factual dispute can be considered "genuine" if the evidence is such that a reasonable jury could possibly return a verdict for the non-moving party. See id. A dispute can be considered "material" if it would affect the outcome of the matter under governing substantive law. Id.

The party moving for summary judgment bears the initial burden to demonstrate that there are no facts on record that support the non-moving party's position. Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). If the moving party satisfies this burden, the non-moving party must then present specific facts showing the existence of a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). At this stage, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita, 475 U.S. at 586-87 (1986)). The non-moving party must put forward specific facts that show a genuine issue

for trial and it cannot rest upon the mere allegations or denials contained in its pleadings. Marten v. Godwin, 499 F.3d 290, 294-95 (3d Cir. 2007). At the summary judgment stage, the court must construe the facts and inferences in the light most favorable to the non-movant, in this case, Plaintiffs. See Matsushita, 475 U.S. at 587; Horsehead Indus., Inc. v. Paramount Commc'ns, Inc., 258 F.3d 132, 140 (3d Cir. 2001).

### III. DISCUSSION

Under the Supreme Court's holding in Monell v. Department of Social Services, 436 U.S. 658 (1978), plaintiffs may bring claims against municipal defendants pursuant to 42 U.S.C. § 1983. However, the Court held in Monell that municipalities cannot be held liable for the acts of their employees based on the theory of *respondeat superior*. Id. at 691. Rather, to impose liability against a municipality, a plaintiff must first prove the existence of a "policy" or "custom" of that municipality, which ultimately caused the constitutional violation or violations at issue. See Pembaur v. City of Cincinnnati, 475 U.S. 469 (1986); Owen v. City of Independence, Mo., 445 U.S. 622 (1980). In other words, to establish a Monell claim, a plaintiff must establish that: (1) the municipality maintained a policy or custom that deprived her of her constitutional rights; (2) the municipality acted deliberately and was the "moving force" behind the deprivation of plaintiff's rights; and (3) plaintiff's injury was caused by that policy or custom of the municipality. Bd. of the Comm'rs of Bryan County v. Brown, 520 U.S. 397, 403-04 (1997). A "policy" is an official statement or proclamation made by an individual with the final authority to make such a decision. Kelly v. Borough of Carlisle, 622 F.3d 248, 263 (3d Cir. 2010). A "custom" is a well-settled practice of government officials that virtually constitutes

law, although not specifically authorized by a written law.  Id.

Plaintiff advances his claim of municipal liability under the theories that the City of Philadelphia failed to properly train and supervise its police officers.  (Pls.' Resp. 3-4.)  A municipality's failure to train or supervise its police officers only gives rise to a constitutional violation when that failure amounts to deliberate indifference to the rights of individuals with whom those officers come into contact.  City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989).  The "deliberate indifference" standard will be met "where a failure to train reflects a deliberate or conscious choice by a municipality."  Id. at 389.

### A.  Failure to train

Generally, to show that a failure to train amounted to deliberate indifference, a plaintiff must show that the failure has caused a pattern of constitutional violations.  See Bryan County, 520 U.S. at 407-09.  It is possible for a plaintiff to maintain a claim of failure to train without showing a pattern of violations; however, the plaintiff will face a high burden.  As the Supreme Court explained in Bryan County, a plaintiff will be required to show that the failure to train falls in the "narrow range of circumstances" where the violation of an individual's constitutional rights is a "highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations."  Id. at 409.  For example, arming police officers without providing any training on the constitutional limitations of the use of deadly force may amount to deliberate indifference, see City of Canton, 489 U.S. at 390 n.10, as could failing to maintain any sort of foot pursuit or partner splitting policy for police officers involved in a foot pursuit, see Pelzer v. City of Phila., 656 F. Supp. 2d 517 (E.D. Pa. 2009).

A plaintiff may *not* establish a failure to train claim by: "(1) presenting evidence of the shortcomings of an individual; (2) proving that an otherwise sound training program occasionally was negligently administered; and (3) showing, without more, that better training would have enabled an officer to avoid the injury-causing conduct." Simmons v. City of Phila., 947 F.2d 1042, 1060 (3d Cir. 1991). A lack of adequate training is demonstrated by "a pattern of tortious conduct . . . rather than [by] a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident." Bryan County, 520 U.S. at 407-08.

Plaintiffs' response to Defendant's motion is largely focused on the alleged failure to supervise and discipline officers, discussed below; however, Plaintiffs also argue that officers are not provided adequate training in the use of force. Plaintiffs admit that officers are given use of force training while in the police academy and that Philadelphia Police Department ("PPD") Directive 22 provides officers with a force continuum to follow when confronted with incidents that may require the use of force.[2] (See Pls.' Resp. 14.) Plaintiffs nonetheless argue that officers' training at the police academy becomes quickly outdated and that "when confronted with a situation which requires the use of force continuum, it is evident that the police officers are not provided with a clear cut standard of how to make decisions on what amount of force is necessary." (Id.)

Defendants move for summary judgment on Plaintiffs' failure to train claim on the grounds that Plaintiffs' only factual evidence in support of their failure to train claim is the testimony of Officer Lynch, and proof of a single, isolated incident will not suffice to show

---

[2] The PPD promulgated Directive 22 in December 2000 to outline the proper use of force by PPD officers. (Def.'s Reply, Ex. A.)

municipal liability.  (Def.'s Reply 9-10.)  Indeed, Plaintiffs rest heavily on the testimony of Officer Lynch to support their assertion.  Officer Lynch testified simply that he could use whatever level of force he deemed necessary.  (Pls.' Resp. 14.)  Plaintiffs also cite to Officer Lynch's testimony that there is no additional baton training after the academy and directives are "sometimes" used.  (Id. at 14-15.)  As noted above, a failure to train cannot be established merely by showing the shortcomings of an individual, such as Officer Lynch.  The argument that "a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability."  City of Canton, 489 U.S. at 390-91.

Plaintiffs' evidence offered in support of their failure to train claim extends beyond the testimony of Officer Lynch, however.  First, Plaintiffs refer to the expert report of Dr. James A. Williams, a law enforcement policy and procedure consultant.[3]  (Pls.' Resp., Ex. 1 at 1.)  Although Dr. Williams concludes that the force used by the defendant officers was excessive and unreasonable, (Pls.' Resp., Ex. 1 at 5), his conclusions do not appear to support Plaintiffs' contention that the PPD failed to provide adequate training to PPD officers in the use of force.  In fact, his opinions appear to cut against Plaintiff's assertions to some degree.  For instance, Dr. Williams confirms that officers nationwide are taught in their basic police academy training to use the minimum amount of force necessary to accomplish their objectives.  (Id.)  As to the PPD, in particular, Dr. Williams concludes that Directive 22 is "consistent with policies and procedures of law enforcement agencies nationwide" and that "[p]rior to 2009 PPD did have

---

[3] To prepare his report, Dr. Williams considered various PPD reports generated as a result of the incident on February 14, 2009 involving Plaintiffs, as well as deposition transcripts of the three defendant officers, PPD Directive 22, and various photographs of Plaintiffs.  (Pls.' Resp., Ex. 1 at 3-4.)

adequate and effective rules and regulations for the training of police officers." Further, Dr. Williams found that "PPD's policies and practices do comport with state-wide and/or nation-wide police department policies, practices, and procedures." (Pls.' Resp., Ex. 1 at 5.) Dr. Williams does note that there was "an underlying failure to appropriately train and supervise" the defendant officers "in the accepted police policy and procedure for the use of force." However, further review of the premises supporting this conclusion and a review of Dr. Williams's "concluding opinions" reveal that his comments focused on the lack of supervision and management by subordinate officers rather than on inadequate training. (See Pls.' Resp., Ex. 1 at 9-10.)

    Finally, Plaintiffs rely on a 2002 and a 2005 Police Advisory Commission ("PAC") investigation report generated after two individual use of force incidents. The 2005 report discusses a use of force incident in which two individuals were hospitalized for significant head injuries resulting from PPD police baton strikes, despite the specific prohibition in Directive 22 from striking a civilian on the head. (Pls.' Resp., Ex. 4.) The 2002 report likewise recommends that one officer involved in the incident at issue receive additional baton training in accordance with Directive 22 and that all officers involved in the incident receive additional training on the use of force continuum. (Id.) As the Defendant points out, these investigation reports appear limited solely to the underlying incidents in question and did not purport to review PPD policies and procedures on the use of force training generally. Rather, recommendations for additional training were made as to the particular officers involved only. In fact, the 2005 policy even notes that the officers' behavior was in conflict with Directive 22, the PPD use of force policy in effect

9

at the time of the incident.[4]

Ultimately, Plaintiffs have not satisfied their burden to show that a failure to train PPD officers amounted to "deliberate indifference" on the part of the City of Philadelphia. At *most*, the evidence offered by Plaintiffs only shows *occasional* negligent administration of a use of force training program that resulted in the incidents underlying the PAC reports offered and the incident at issue in this case. Without more, Plaintiffs are unable to advance to trial on their failure to train claim against the City of Philadelphia.

**B.   Failure to supervise, discipline, or control**

A municipality will only be liable on the basis of a failure to supervise if a plaintiff identifies a specific supervisory practice that the municipality failed to employ, "contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents," and circumstances under which the inaction of a supervisor could be found to have communicated a message of approval to a subordinate. C.H. ex rel. Z.H. v. Oliva, 226 F.3d 198, 202 (3d Cir. 2000). In support of their failure to supervise claim, Plaintiffs cite to the same documents and reports referenced as evidence of an alleged failure to train. Plaintiffs assert that

---

[4] Plaintiffs also cite to a July 1999 report generated by the Integrity and Accountability Office ("IAO") that addressed the issue of excessive force used by PPD officers. (Pls.' Resp. 11; see also Pls.' Resp., Ex. 2.) The conclusions of this report largely focused on the need for more accurate reporting and review of use of force incidents rather than on officer training specifically, though officer training was addressed toward the end of the report. Nevertheless, the data reviewed and analyzed in creating this report was collected between the mid- and late-1990s. As Defendants point out in their reply brief, the 1999 report notes that the PPD was in the midst of reforms to the process for reporting and reviewing use of force incidents. Indeed, the PPD incorporated many of the recommendations of the 1999 IAO report into Directive 22. Therefore, reliance by Plaintiffs on the 1999 IAO report, generated ten years prior to the incident in question in this case, as evidence of recent PPD training and supervision polices, is misplaced.

"[a]bsent a complaint by a victim or third party witness, there is no system to monitor incidents of police brutality." (Pls.' Resp. 9.) Plaintiffs also note a need for more accurate reporting of use of force incidents. (See, e.g., Pls.' Resp. 11-12.) Defendant argues that Plaintiffs have put forth insufficient evidence to support their claim of failure to supervise, as any evidence Plaintiffs *have* cited in support of their claim is "either irrelevant, outdated, or both." (Def.'s Reply 3.)

      Plaintiffs again cite to the expert report of Dr. James Williams in support of their claim for failure to supervise. As noted above, Dr. Williams concluded that there was an underlying failure to supervise the officers involved in the incident at issue. (Pls.' Resp., Ex. 1 at 9.) Dr. Williams further concludes that the PPD and City of Philadelphia "failed to appropriately supervise and manage the subordinate actions of the *above named police officers*." (Id. at 10 (emphasis added).) Dr. Williams also opines that this failure of supervision "*relative to the above incidents* . . . set a tone of deliberate indifference." (Id. (emphasis added).) Thus, while Dr. Williams states that the PPD was "deliberately indifferent," his findings relate only to the police officers involved in this particular incident. Dr. Williams does *not* highlight a more systematic failure of the PPD to supervise officers' use of force. In fact, Dr. Williams notes that the "police officials in the instant case" actually *disregarded* mandated PPD policy, practice and procedure. (Pls.' Resp., Ex. 1 at 10.) Dr. Williams's expert report does not appear to support Plaintiffs' claim for failure to supervise.

      Moreover, Plaintiffs have put forth insufficient evidence to support their assertion that "[a]bsent a complaint by a victim or third party witness, there is no system to monitor incidents of police brutality." (Pls.' Resp. 9.) As noted by Defendant, Directive 22, in fact, provides for systematic notification and review of use of force incidents. Specifically, Directive 22 mandates

every officer to fill out a use of force form whenever physical force is used, and provides for the following layers of supervision for use of force incidents: (1) supervising officers will be notified whenever force is used by a subordinate officer; (2) a supervising officer will review the use of force report generated by that subordinate officer; (3) the Internal Affairs Board ("IAB") will be notified whenever force is used and a copy of the use of force form will be forwarded to the IAB. (Def.'s Reply, Ex. A at 11-12.)

In addition, Defendants cite to Internal Affairs Bureau ("IAB") Policy #28, instituted in June 2000, that specifically lays out a "case review program." The case review program was designed "to better monitor and modify the actions of Police Department sworn personnel" by creating an internal review system. This system provides for periodic review of the activities of PPD officers, particularly those officers against whom multiple complaints have been lodged or who have displayed a pattern of inappropriate conduct.[5] (Def.'s Resp., Ex. B.)

Finally, Plaintiffs cite to a 2005 IAO report in support of their failure to supervise claim. Yet, the 2005 report reviewed and analyzed officer-involved shootings. (See Pls.' Resp., Ex. 3.) In fact, the specific pages to which Plaintiffs direct the Court's attention discuss PPD Directive 10 – a separate PPD policy that applies to the use of deadly force – as it relates to firing weapons, and PPD's model for investigations of shootings. (Id. at 35-37.) The 2005 report is, therefore, not pertinent to the incident and the related policies at issue in this case.

At bottom, the record shows that PPD had policies in place for ensuring accurate

---

[5] As noted above, to the extent that Plaintiffs reply on the conclusions of the 1999 IAO report that more supervision was needed with regard to use of force incident reporting, the Court finds such reliance misplaced in light of the promulgation of Directive 22 and Policy #28 in 2000.

reporting and supervision of use of force incidents, namely Directive 22 and IAB Policy #28. Plaintiffs have offered insufficient evidence to indicate a pattern of violations of those policies or that relevant supervisors in this case had "contemporaneous knowledge" of any inaccurate reporting by the defendant officers that they chose to ignore. Evidence that suggests these particular officers were not properly investigated after this isolated incident is not sufficient to overcome summary judgment on a claim for municipal liability.

### IV. Conclusion

Because Plaintiffs have failed to show an insufficient training or supervisory practice on the part of the City of Philadelphia, and have therefore failed to show deliberate indifference, Plaintiffs cannot advance to trial on their claim of <u>Monell</u> liability. Accordingly, Defendant's motion for summary judgment will be granted and the City of Philadelphia will be dismissed as a defendant in this lawsuit.

An implementing Order follows.